Oral argument not to exceed 15 minutes per side. Mr. Warhatch for the appellant. May it please the court, I'm David Warhatch and I represent the appellant, plaintiff Emily Bahr in this case, and I'm reserving five minutes for rebuttal. Fine. I'm a life member of the court, I haven't been here for a while. Welcome back. Thank you. I was a federal judge's law clerk, and I'm going to tell you why this story, why this applies to this case in a minute. I was a federal judge's law clerk in the Western District of Michigan, and at that point I was asked by the judge to help him sketch out an opinion on a case. And he told me what he thought it should be, and when I looked into it I thought that his decision was wrong. It was an appeal of an arbitrator's ruling. And I thought that the arbitrator had substituted his own brand of industrial justice for what the collective bargain agreement said. And I argued it with the judge, argued with the judge, and the judge finally said, I was appointed by the president and do it my way. And then came the opinion from the Sixth Circuit a few years, about a year later, and the judge sent it to me with a note attached, said, I thought you'd be interested in this decision. And he highlighted the part of the opinion where it said that the Sixth Circuit recognized the heroic effort of the district judge to save this arbitration award, but however, the arbitrator had substituted his own brand of industrial justice. I've looked at this decision from the district court in this case. I think it's an heroic effort to try to save the appellee, the defendant, technical consumer products in its interpretation of this bonus plan. But in reality, I believe that ultimately the court should find that the district court was misguided in this case and should not have ruled the way it did. The pivotal issue in this case is where Minnesota law governs, by what time does a party to a contract that's reserved for itself some modicum of discretion to modify or rescind the agreement, by what time does that party have to exercise that discretion? Or looking at it from a different perspective, at what point do the rights of a party to a contract vest when the contract reserves for the other party the privilege of modifying or rescinding the agreement at any time? Under your theory, could technical consumer products modify the contract to pay a bonus on December 25th? Theoretically, they could have. So even though Ms. Barr would have performed virtually all of her activities by that date, the company could still say we're going to exercise our discretion because we have no money and we're not going to pay any bonuses this year? Because of the specific way they designed this bonus plan, yes. They defined bonus year to include the 2011 calendar year. So any time prior to the end of that year, they could have theoretically done so. There might have been promissory estoppel issues, might have been unjust enrichment issues, and the contract issue. In terms of a unilateral contract? Yes. So wasn't there some letter that they sent at the end of December that said something to the effect of we're rethinking how we're going to calculate our bonus? Yes. There's a few things that need to be addressed with respect to that letter, though. The letter, the record shows there were two types of bonus plans. One was a subjective plan that applied to management, senior management. And then there was this other plan that was applied to my client, which was the district sales manager contract. There's nothing in the letter that suggests that the objective measurements made after the end of the year to verify the sales volume and margin figures would, in fact, be altered sometime in the period of time between January 1 and the time that the decision was made on February 3 to reduce the amount of her bonus. The letter itself merely confirms, basically it says that we're accelerating bonuses for the Christmas season and that we're going to make final determinations on the amounts of bonuses later. But my client's bonuses were based on objective criteria, and other bonuses in the company were based on subjective criteria. My client's bonuses were not subjected to the subjective analysis, but rather the objective analysis. By midnight on December 31, 2011, TCP had not adjusted the bonus payout grid. It had not revoked the bonus plan. It had not modified the plan and had not informed Ms. Barr that she was ineligible under the plan. In order to receive a bonus equal to 200% of the base salary, what my client had to do was increase territory sales by at least 100%. She hit 113%, and she was required to produce sales margins of at least 40%, and she hit 42%. The key other feature of the plan, of course, is she had to remain in the employ of the company through the end of the year, and she, of course, did that. She did not quit. She was an at-will employee. She could have left the company at any time. In fact, if she had not been given the bonus plan that was promised her at the time she hired on the year earlier, she would have left the employ of the company. But as an at-will employee, she did not have to stay seven minutes, let alone seven weeks or seven months. So we believe that at that time, all of the indicators of whether or not this became an enforceable contract, executory according to its terms, all of that matured at the stroke of midnight on December 31, 2011. Minnesota law on these issues could not be more clear. The key issue here, of course, is once a party has offered to enter into a unilateral contract, can that party now revoke that after the other party has already fully performed? And my contract law professor at Notre Dame is going to tell, he may rest in peace, but he would make sure it very clear that the full performance of the expected performance is enough consideration to support the unilateral offer. Once the decision was made to incentivize the employees to meet the sales executive's pledge to the chief executive officer to triple sales and to produce more profitable sales, once that was satisfied in this case according to the executive's own plan, it became a fully enforceable provision under Minnesota law. The bonus plan did reserve discretion to make changes, but the same Minnesota law on contracts makes it clear that those changes have to be communicated to the offeree and they cannot be made unilaterally after the consideration already has been tendered. And in this case, the record is very clear that Ms. Barr did not receive any notice from anyone concerning any adjustment of the bonus plan until well after the end of the bonus plan year. So I'm sorry to get back to this, but I have just found this December 21, 2011 letter. Why is that not letting her know that their ability to pay the bonuses is not yet determined and a heads up that the bonus can be less than was originally? Again, this letter went to two classes of bonus-eligible employees. And so it doesn't apply to her because she was on an objective set of criteria? There is nothing indicating this plan was never modified or rescinded by management through the end of the year, even after that letter was sent. So consequently, the plan does not say that we, unlike some of the cases that TCP relies on, where the plan says we can make these determinations even after the end of the bonus year. This plan never said that determinations could be made after the end of the bonus year. Why isn't this letter changing the situation? It doesn't address the plan itself. The plan itself says in bold and unmistakable terms that if you achieve these objectives, you will in fact receive this bonus. They did not say in that letter, for example, we're rescinding the bonus plan for the district sales managers. Nor did they send a separate letter to Ms. Barr herself saying you're now ineligible, or we've rethought. This letter of the 21st of December is saying our ability to pay bonuses won't be determined until the books are completely closed. There are many reasons why we can't pay you, essentially. So why doesn't that constitute a written communication that the bonus is not going to be the same as the amount that was 200% of her sales? This letter, or this email, was directed to the question of prepaying some bonuses so they would have something for Christmas. It says nothing about rescinding or modifying, adjusting the basic bonus plan under which my client was subjected. Now, if they had sent something separately and said, by the way, this changes the district sales manager bonus plan, then my client would be on notice. But there is no notice whatsoever given in that letter. That's all I can really say about that. I think that I did address that pretty well in the briefs, and I would commend your attention to that. I will reserve the balance of my time for rebuttal. Good morning. May it please the Court. My name is Evelyn Schoenberg, and I represent Technical Consumer Products, also known as TCP here. We are here today to urge this Court to uphold the district court's decision that the bonus plan under consideration unambiguously vested full discretion within TCP to decrease, modify, or withhold the award, as well as change the bonus plan at any time. There was no qualification in the language of the plan that limits the time within which it can and or did change the plan and or the awards awarded thereunder. Also, extremely important here, the judge below held, and Mr. Warhatch has really not addressed the fact that there has been no evidence of an offer as evidenced by the TCP bonus plan. In order to even get into the discussion of whether or not a unilateral contract exists, one must examine the elements of a promise of a contract, the first one of which under Minnesota law, which is much like black-letter law of all over the states, is whether or not an offer was made. Judge Leoy correctly found with the retention of discretion retained by TCP, there was not a definite enough offer or promise that was made by TCP that would have created the foundation of a contract. Is the contract purportedly the document at page ID 1446, which says C&I sales bonus plan terms and conditions? Is that the document we're talking about? Yes. Yes, Your Honor. So why isn't it an offer in the first paragraph, you can earn up to 200% of base salary if certain objectives are achieved? All payouts will be paid. Then you go into the second sentence, or the second subsection of it, in bold letters, plan subject to change. So right after it says this is the terms and conditions, all payouts will be paid no later than 45 days, unless otherwise noted, all bonus plans are annualized, and all computations and allocations will be established by the company and arbitrated by the company. Then immediately thereafter, you know, everybody understands, plan is subject to change. Right, but your opponent's argument is that the plan was not changed during the year, that she fully performed during the year, at the end of the year she has done everything she needs to do to get the 200% of base salary bonus. And under the terms of the plan itself, it says specifically, management reserves the right to amend or change or cancel the bonus plan at its discretion, and then it says it also reserves the right to reduce, modify, or withhold awards based upon individual performance or management modification. The fact that the management modification was not made until early or mid-January, as Val Campbell, in the letter that you, Judge Moore, described, the email that was issued on December 21st, says very plainly to all employees, all employees, as you all know, I have told you all year, we cannot finalize bonuses until after we close our books, which will not occur until mid-January. All employees were put on notice of that as late as December 21, but we would argue as early as July 1 when this bonus plan was issued and distributed to the employees. Your opponent is arguing that the December 21 letter is not a sufficient written communication under the terms of the contract. And I don't understand, I'll be quite honest, I don't understand the logic of that argument only because what type of notice is deemed sufficient under the terms of this bonus plan? And I would argue as long as you get notice of some sort, whether it be via an email or face-to-face or perhaps a letter, what would make one question the properness of this particular notice? The plaintiff or the appellant did testify that she did receive this letter. She did receive it on December 21. In fact, this letter came as one of the initial disclosures provided by plaintiffs in the court below. So there's no doubt that she had received this letter. It seems questionable for a company to lead employees on to believing that they're going to get bonuses up to 200% and that she was the best-performing salesperson in the whole company. To lead them on to believing that if they do their very best and they are top salespeople, they can get 200% of base salary and have somebody work as hard as they can to perform and then on the 21st of December say, oh golly gee, we don't know how the company is doing, we're going to calculate this later on, and then say that's sufficient to change the whole structure and give much tinier bonuses, if at all. It just seems really dubious behavior. I understand you're questioning this, but I would like to put into the context of the facts here that are on the record and that occurred in this case. The bonus plan wasn't issued until July 1, mid-year of 2011. At the time the bonus plan was issued, it states by its terms it is retroactive for the previous six months of that year. At the time this bonus plan was issued, and again the very first subsection says plan subject to change, but at the time it was issued, the appellant admittedly, again in her testimony, was tracking, was right there. She was tracking on making the goals that were stated in the bonus plan. Yes, she worked hard. She was hired to work hard, and she was encouraged to continue to work hard. There's nothing in the record to say that she went over and above whatever she was doing even before the bonus plan was announced. So with the fact that TCP very fully and honestly, when they disclosed this bonus plan, says right up front, it's not little tiny letters, it's right up front, we have reserved to ourselves the discretion to change this bonus plan. Did that bonus plan apply to all employees including the district sales managers or just the district sales managers? District sales managers and the regional sales managers of a certain department it applied to. And in addition to the bonus plan reserving the right to change and alter the bonus plan itself, I do think it's important to look at the second sentence of the Reservation of Rights, which is, we're also reserving the right to change, alter, reduce awards. And as Val Campbell, the CFO, informed all employees, in December awards can't be finalized until we close our books, which would be in January. And what TCP did here, in good faith, there's no evidence in the record of bad faith. But counsel says there were, you know, in effect, two groups that could get bonuses. The ones that Ms. Barr fell into where it was a mathematical calculation. And then there were the subjective bonuses, the bonuses for the other people based on how hard they worked or how loyal they were or whatever. But were not calculated, not subject to calculation on some kind of a grid or some kind of a... So isn't it possible that the modification language and the we don't know how much we're going to be able to give you yet until January applied there and not to the folks that were out beating the bushes and driving up and down the highways trying to make sales? I would respectfully differ with that conclusion, Your Honor, and that's because Ms. Campbell in the letter did not go to those lengths of saying this only applies to certain but not all. She says, as I've told you all year long, we cannot determine bonuses until we close the books. And, yes, there were other employees at TCP that were under different bonus plans and others that were under no bonus plans. And the record was not very well developed as to how many other bonus plans existed, but the record does show there were other bonus plans in existence. Just the one that was relevant for this litigation was the one that applied to the appellant, of course. But all employees were put on notice, not just by the December 21 letter from Val Campbell, but also when the bonus plan itself was issued on July 1, that this is subject to change. And, you know, we're looking at Minnesota law here, and we have cited in our case, and the judge below did rely on this case a lot, the Brozo case, which is a Minnesota case. And in that case, the court actually reversed a jury verdict, finding that there was a unilateral contract created by a plan similar to the one we have here. The district court or the appellate court in that Brozo case reversed the decision of a jury because of language virtually identical to the discretionary language contained in this bonus plan. As the Brozo case said, because of that reservation of discretion, there could be, at the first instance, no offer, no definite offer to even create a contract, unilateral or bilateral. On the other hand, they went further and said, okay, if an offer was present under this language in the plan there, and let's assume, therefore, assuming arguendo, a unilateral contract or bilateral contract was created, the fact that that contract would contain a discretionary ability of one party to change, then you look at that contract, if you assume it's a contract, and has that particular term been breached when the one party decided to exercise their discretion. In that case, the Brozo case clearly stated under Minnesota law that can be examined, perhaps should be examined, but under a very limited manner in which we examine that, which would be there has to be some evidence of fraud, bad judgment, or mistaken exercise of judgment. So your position is that under this contractual language, Ms. Barr could do all of the work, the year could conclude, hypothetically there's been no other communication other than the July 1 contract that's at page 1446. In other words, no letters, no oral communications, hypothetically. And the company could say in January, after the year is done, oh, we don't have any money this year, we're paying no bonuses. As horrible as that result would be, I believe because of the reservation of discretion, yes. Why shouldn't there be an implication in the contract that the reservation of discretion has to be exercised within the contract year? Because the party who wrote the contract clearly stated it can be exercised. We reserve the right to exercise the discretion to do these things as well as modify the award period. But it didn't say after the fact. It says modify the award. And in the first paragraph of the Bonus Plan Terms and Conditions, the award is not issued for 45 days following the bonus period time. So in my view of this, when you modify, you reserve the right to modify an award and that award can't be... It says all payouts will be paid no later than 45 days. Correct. It doesn't use the word award there, does it? Correct. But then you look at that in conjunction with Val Campbell's email saying that we cannot determine any bonuses until we close our books. And, you know, from a public policy standpoint, for a business to operate and to provide incentives, and this is an incentive for the sales employees to go out there and sell more, certainly it is. I would never say it is not. But what they did do up front was say, okay, we have the reservation of our rights to exercise discretion. Emily Barr saw that on July 1. She very well could have disagreed with that and said, I don't agree with these terms because I don't think it's fair and people will do that. And that's our free enterprise system. But for companies to... So the employee could, you're pointing out, could say I don't like this bonus system, therefore... I'm going to leave now. I'm not going to work any harder than I think I should be potentially penalized and get nothing. And it must be understood here, Emily Barr did get something. She got what I would call a substantial bonus, 80% of her salary. It wasn't that she got nothing. I think there's also a very important issue here that I would like to quickly touch upon. There was absolutely no promise or representation that there would be a bonus of any kind in place when Ms. Barr took the job at TCP. It was a series of e-mails that she entered into with one of the TCP salespeople and she asked questions, you know, is there a bonus plan? And in her testimony, the only time the bonus plan was, or I should say a bonus plan was even discussed was in this series of e-mails. And it's very clear in those e-mails. There's nothing definite. This is my guess. This is what we're working on. Maybe 50% of your salary could be earned. I see my time is up. And if you have no other questions, I thank you all very much. Thank you. I'll try to address as many of the points that I just heard as I can. On the question of whether an offer was made or not, I would assume that the court has already looked at the district court's decision. At pages 14 to 15, the court itself indicated that the bonus plan was very definite as to what conduct entitles an employee to bonus and how the bonus will be calculated. On this narrow point, the court agrees. There's no question but that an offer was made in this case, and the offeror is the master of his or her offer. In this particular situation, there's nothing in the terms of the offer that was extended. Whether it was extended as part of bilateral negotiations in June of 2010 or as part of a unilateral offer in July of 2011, there's nothing in there indicating that the offeror was, in this case, indicating that it would be able to make a decision after full performance to decide to reduce unilaterally, reduce the amount of bonus that would be earned. The Brozo case, to which Learned Counsel opposite has referred, both in the briefs and today, is actually a case that is quite distinguishable because in that bonus plan, there's an express reservation of the ability to make alternate determinations on the amount of bonus after the end of the bonus year. There is no such language in this particular case, and I would commend this court's attention to the dissent in the Brozo case because I think that should be required reading, and I hope you will also take a look at the reply brief that I put in this case before making a decision in this case. Brozo's dissent, I think, really captures what this case is all about. But the distinguishing feature in Brozo is that there was an allowance to make, express allowance to make decisions after the end of the bonus year, and in this case, that doesn't exist. The offeror in this case is the one who crafted the plan, and TCP, therefore, if there was any ambiguity as to what would constitute appropriate notice under Minnesota law, it was up to TCP to put that into the plan as to what would constitute such notice. Minnesota law makes it very clear that rescission of a unilateral contract offer must be communicated, and it has to be in some clear, conspicuous, some fashion to make it clear that whatever you were thinking you were operating under, if you were thinking you were going to get a $100 reward for bringing the kitty home, that's not going to be the case. I have revoked that offer. Well, that hasn't happened in this case. Well, the December 21st letter is the big adjustment. That's what they claim. But they claim that, but there's nothing conspicuous or clear about that, and there's nothing indicating that the decision to abrogate what the chief sales executive offered with the permission, the concurrence of the chief executive officer, could be rescinded, modified, or whatever by the chief financial officer. More importantly, the chief financial officer's testimony in the deposition indicated that she was all of a sudden concerned about some bank covenant that might be breached, yet there's clear evidence that the bank had not said anything about there being a potential breach of the bank covenant, nor... So are you saying that the company has to have a good reason to cancel the bonus plan? If they reserve for themselves absolute discretion, which is what the judge here has said, the district judge, then theoretically they can make a decision before the end of the year that they're going to get rid of the plan. Right, and then why isn't this letter of the 21st of December saying, hey, we're going to modify the plan, we're going to have it be a lot smaller because it's a hard economic time, and whether or not that's true, that's what the company CFO is saying on behalf of Ellis and the entire senior management team. Well, first of all, there has to be some objective, good faith basis because otherwise then we could raise the question of fraud. We did not raise the question of fraud because we didn't see anything in the record suggesting that there was fraud, other than the fact that the chief financial officer testified that she told the senior most sales executive of this bank covenant issue, but the senior most sales executive himself testified he never heard that from the CFO. That kind of factual dispute over a genuine matter, if the court determines that that letter is pivotal, that becomes a genuine dispute as to a material fact in the case that would preclude summary judgment would require a trial as to what actually that letter was directed at, et cetera. But the judge took it, the district judge took it at face value that this applies obviously to put my client on notice that her plan has been modified. Nothing in that letter says that. And, in fact, I think the Minnesota law makes it clear that they would have had to have made a very clear delineation that this is affecting your plan, Emily Barr. They never did. And that's, I think, the biggest problem there. So to be clear, your position is this letter doesn't even pertain to your client. And is that really your position? Well, it's not clear that it pertains to my client. They did not make that clear. They sent out this memorandum, but it doesn't pertain to my client other than the fact that they did, in fact, pay part of her bonus before the Christmas holiday. Wait a minute. Are you conceding that it could pertain to your client? Not to put words in your mouth just to get your position. Is it your position that it's not clear that it pertains to your client but it could pertain to your client? Or is your position something else? My position is a little bit different than that, Your Honor. It is that whatever that email is, it is not sufficient to modify, abrogate, rescind, or make the bonus plan or make my client ineligible for the bonus as promised under the terms of the plan. By the time this email had been sent out, my client had already achieved the required standards to be able to qualify for a full 200% bonus. They did not make it clear that they were eliminating that or rescinding that or making any adjustment to her plan or making her ineligible for that bonus. The issue in this case all goes down to the question of the confidence of those that enter into promises in a contractual fashion in the economy. They have a right to expect that the other party to the contract is in fact going to live up to their obligations. In this case, they did not. Thank you very much. Thank you very much, Your Honor. I ask the court to remand this case with instructions to enter judgment for my client on her motion for summary judgment. Thank you. The case will be submitted. Would the clerk call the next case, please?